## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**DEREK CURRY,**

      **Petitioner,**

**vs.**                                **CASE NO. 4:07cv351-SPM/WCS**

**WALTER A. McNEIL,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION

This is a petition for writ of habeas corpus filed by Derek Curry pursuant to 28 U.S.C. § 2254. Doc. 1. Petitioner challenges his convictions for armed robbery, armed kidnaping, and armed carjacking in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 2001CF3803A1. Respondent filed an answer, doc. 20, with the record in paper form, and Petitioner filed a traverse, doc. 24. Respondent agrees that the petition was timely filed. Doc. 20, p. 4.

**The Trial Evidence**

The offenses occurred on September 21, 2001. The female victim had just pulled into her driveway at 11:30 p.m. and was cleaning out her car when she noticed a

dark blue minivan drive by.  Ex. G, Petitioner's initial brief on appeal, p. 3 (citations hereafter to Ex. G are to this brief).  A man wearing a ski mask and pointing a gun jumped out and demanded her keys.  *Id.*  She complied and was placed in the back seat of her car with her face down.  *Id.*  The man drove away from the apartment complex in her vehicle.  *Id.*  Less than five minutes later, the vehicle stopped and another man got into the car.  *Id.*  The victim was searched and her wallet was taken. *Id.*  A ski mask was placed over her head so that she could not see.  *Id.*  While one man searched her pockets and wallet, the other man, the passenger asked questions "like if I wanted to be raped."  Ex. F, trial transcript, R. 94.

After being driven around for awhile, the victim was forced to go to an ATM machine and withdraw $600.  Ex. G, p. 3.  The two men told her they would shoot her if she ran and that they would run her down with her own car.  Ex. F, p. 99; ex. G, p. 3. After she had given the two men the $600, they became angry because they thought they should get $1,000, and told her that "now" she would be hurt.  Ex. F, R. 100.  She was driven around some more and then her hands and feet were bound with plastic cord and masking tape by the passenger of the vehicle.  Ex. G, p. 4.  She was kept in the vehicle for some time and there were frequent stops, with the passenger getting in and out.  *Id.*  She was threatened the entire time, and repeatedly told that they would dump her body somewhere.  Ex. F, R. 102.  At one stop the victim said she heard one of the men tell her that she was "going to die, he was going to shoot me," and heard a female voice say "oh, my God."  *Id.*, R. 104-105.  Finally, the vehicle stopped, she was untied and told to keep her head down for two minutes.  *Id.*  She did so and discovered that the assailants had left her and her vehicle.  *Id.*  She drove to a friend's house and

called 911.  *Id.*  She described the driver of the vehicle as being about five feet eight

inches tall, about her own height.  *Id.*  She had been able to "look at him eye-to-eye."

*Id.*  She never saw the second person but believed him also to be of average height.  *Id.*

Earlier on September 21, 2001, the night of the offense, another person had his

Dodge Caravan stolen from the Tallahassee Civic Center.[1]  Ex. F, R. 143-144.  The van

had been parked at the Civic Center at about 6:30 p.m. and was noticed stolen about

three hours later, at about 9:30 p.m., two hours before a van was seen by the victim.

*Id.*, pp. 143-144.  At 2:00 a.m. the next morning, an abandoned blue Caravan with a

broken window was found by a police officer.  Ex. G, p. 4.

The State also presented *Williams* rule evidence[2] of an uncharged robbery.  On

September 2, 2001, 19 days earlier, a college student, last name Warren, had returned

to his apartment at about 9:30 p.m.  *Id.*, p. 5.  A blue Chevrolet Cavalier came past him

and two men got out.  *Id.*  One pointed a revolver at him while the other took his wallet

and keys.  *Id.*  A third person was driving the Cavalier.  *Id.*  The victim was pushed into

---

[1] Petitioner's brief on appeal states that the Dodge Caravan was stolen on
September 12, 2001, a typographical error.  Ex. G, p. 4.

[2]  The rule comes from <u>Williams v. State</u>, 110 So.2d 654 (Fla.1959).

Under the *Williams* rule evidence of other crimes, wrongs and acts is
admissible if it is relevant to and probative of a material issue even though
the evidence may indicate the accused has committed other uncharged
crimes or may otherwise reflect adversely upon the accused's character.
Section 90.404(2)(a), Florida Statutes, (1983), codifies the ruling in
*Williams v. State* and lists the purposes for which such evidence is
deemed to be admissible: proof of motive, opportunity, intent, preparation,
plan, knowledge, identity, or absence of mistake or accident.

<u>Buenoano v. State</u>, 527 So.2d 194, 197 (Fla. 1988), *cert. denied*, 523 U.S. 1043 (1998).

the front seat while the gunman got into the back seat. *Id.* Two of the men wore ski masks. *Id.* They stopped, he was put into the back seat, a ski mask was placed over his face, and his hands and feet were bound with insulated wire and tape. *Id.* He was placed into the trunk of the vehicle. *Id.* He was taken to an ATM machine and forced to withdraw $400. *Id.* The men stopped the car and left, leaving the victim with his car. *Id.* The victim identified a photograph of the man who he thought had been the driver; he described the driver as being six feet two inches or four inches, but the gunman was shorter. *Id.*, p. 6. In a photographic lineup of 18 photographs, this victim identified Petitioner's photograph as the person who robbed him. *Id.* and transcript, R. 265-269. He also identified Petitioner in court as the person who kidnaped and robbed him. *Id.*

A latent print was found on the exterior passenger door of the stolen Dodge Caravan involved here. Ex. F, R. 309-313. This latent print was identified as Petitioner's right palm print. *Id.*, R. 360-361, 364.

A latent print was also lifted from the right rear side window of the victim's Jeep. *Id.*, R. 331. This latent print was identified as Petitioner's left palm. *Id.*, R. 364-365.

The victim had reported that she had been sexually assaulted during the kidnaping. Ex. B, R. 22. The victim said that she was sexually assaulted by the driver of the vehicle, and that the other person was not present when this happened. *Id.*, R. 71. Petitioner was not charged with sexual assault, and his attorney moved to have this evidence excluded at trial. *Id.*, R. 22.

**Section 2254 Standard of Review**

Habeas corpus relief may be denied on the merits notwithstanding the failure of the petitioner to exhaust state remedies.  § 2254(b)(2).[3]  But habeas corpus relief may be granted only if Petitioner has properly exhausted his federal claims in state court.  § 2254(b)(1) and (c).  To do so the federal claim be fairly presented to the state court, to give the State the opportunity to pass upon and correct alleged violations of federal rights.  *See* Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004) (citations omitted); Duncan v. Henry, 513 U.S. 364, 365-366, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995).  While it is not necessary that the petitioner cite "book and verse" of the Constitution, the state court must be alerted to the fact that a federal constitutional claim is raised.  Duncan, 513 U.S. at 365-366, 115 S.Ct. at 888 (citations omitted); *see also* McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) (holding that a petitioner must "do more than scatter some makeshift needles in the haystack of the state court record") (citations omitted).

The petitioner also "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (applying this one complete round requirement to state collateral review process as well as direct appeal).  If a claim is not fairly presented through one complete round of state court

---

[3] If no constitutional claims are raised, then §2254 is inapplicable and the exhaustion inquiry is irrelevant.  Engle v. Isaac, 456 U.S. 107, 120, n. 19, 102 S.Ct. 1558, 1567, n. 19, 71 L.Ed.2d 783 (1982).

review and review is no longer available in state court, it is procedurally defaulted and the petitioner must demonstrate cause and prejudice for the default *or* a miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).[4]

For a claim fairly presented and adjudicated on the merits in state court, and pursued through one complete round of the review process, Petitioner must show that the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[5]  § 2254(d)(1) and (2); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146  L.Ed.2d 389 (2000).  Only

---

[4] The miscarriage of justice exception applies only to extraordinary cases, where a constitutional violation has probably resulted in conviction of an innocent person. McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991). *See also* House v. Bell, 547 U.S. 518, 536-537, 126 S.Ct. 2064, 2076-2077, 165 L.Ed.2d 1 (2006) (explaining what must be shown to demonstrate actual innocence as a "gateway" to review of a defaulted claim).

[5] A presumption of correctness is accorded state court findings of fact by former § 2254(d), and now by § 2254(e), even though the state court did not hold a hearing with live testimony, but simply considered affidavits, other evidentiary materials, and the trial record.  May v. Collins, 955 F.2d 299, 310 (5th Cir.), *cert. denied*, 504 U.S. 901 (1992), *citing*, Sumner v. Mata, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

> The fact that a 'live' hearing was not held is not controlling, and the state habeas court can generally even resolve conflicts in affidavits, where the judge who presided at trial also presides at the habeas hearing, as was the case here.

West v. Johnson, 92 F.3d 1385, 1411 n. 47 (5th Cir. 1996), *cert. denied*, 520 U.S. 1242 (1997).

an adjudication of the merits, not an explanation or written opinion, is necessary for this deference to apply.  Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) ("all that is required is a rejection of the claim on the merits, not an explanation.");  Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 776 (11th Cir. 2003) (same);  Herring v. Sec'y for the Dep't of Corr., 397 F.3d 1338, 1347 (11th Cir.), *cert. denied*, 546 U.S. 928 (2005) ("[e]ven a summary, unexplicated rejection of a federal claim qualifies as an adjudication entitled to deference under § 2254(d)." ).  The presumption of correctness of state court factfinding may be rebutted only by "clear and convincing evidence."  Miller-El v. Dretke, 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005); § 2254(e)(1).  If Petitioner can establish the requirements of § 2254(d)(1) or (2), then this court reviews the federal claim on the merits, without the deference otherwise required.  Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858-59, 168 L.Ed.2d 662 (2007); Jones v. Walker, 496 F.3d 1216, 1228 (11th Cir. 2007) (citing Panetti).

The law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 1204 (2001).  *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing Chandler).  There are no rigid requirements or absolute duty to investigate a particular defense.  Fugate v. Head, 261 F.3d at 1217.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always better.  Stacking defenses can hurt a case.  Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

*Id.*

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."  466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

A state court's adjudication of an ineffective assistance claim is not "contrary to" the rule of <u>Strickland</u> as intended by § 2254(d)(1) even if this court might have applied <u>Strickland</u> differently. <u>Williams</u>, 529 U.S. at 406, 120 S.Ct. at 1520; <u>Bell</u>, 535 U.S. at 698, 122 S.Ct. at 1852. To determine whether the state court's adjudication was an "unreasonable application" of <u>Strickland</u>, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . . Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." <u>Bell</u>, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* <u>Williams</u>). "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." <u>Williams v. Taylor</u>, 529 U.S. at 410, 120 S.Ct. at 1522.

**Ground One**

Petitioner contends that he was denied due process and his Sixth Amendment right to counsel because the prosecutor overheard an audio recording of an allegedly privileged telephone call between Petitioner and his attorney, and then used this recording to prepare for trial. Doc. 1, p. 4; p. 5 on ECF (the page number assigned to the document on the electronic case filing docket). He asserts that he and his attorney discussed evidence and trial strategy during this telephone call. *Id.*, p. 4a; p. 6 on ECF. Petitioner explains in the traverse that he trial was to commence in only 12 days and he needed to talk with his lawyer for legal advice. Doc. 24, p. 3. He knew that his attorney would not accept a direct collect call, and he was indigent and could not pay for the call. *Id.* Petitioner states that he borrowed another prisoner's telephone pin number and placed three-way call, a call to his girlfriend who connected the call to Petitioner's

attorney but stayed on the line.  *Id.*  Petitioner admits that this telephone call to his girlfriend was "legitimately recorded by jail authorities," *id.*, p. 5, but asserts that he had an expectation of privacy because he was indigent, could not reach his lawyer any other way, and was then only 12 days away from trial.  *Id.*  Petitioner explains that the jail formerly permitted toll-free calls from a prisoner to a lawyer, but had stopped this, leaving him with a three-way call as his only alternative.  *Id.*, pp. 3, 5-6.  Petitioner argues that having his girlfriend on the telephone when he talked with his lawyer was reasonably necessary for the transmission of his attorney-client communications, and thus protected as an attorney-client privileged communication pursuant to FLA. STAT. § 90.502(1)(c).  *Id.*, p. 6.

The claim was raised by a motion to dismiss the information.  Ex. F, trial transcript, pp. 8-18; Ex. B, R. 116-118.  The motion was based upon "prosecutorial misconduct."  Ex. B, R. 117.  At the hearing on the motion, Petitioner's attorney argued that Petitioner would be denied equal protection and due process because during the telephone conversation, he and Petitioner discussed "all of our defense strategy with respect to cross examination of witnesses, with respect to the need to call specific witnesses, alibi witnesses, and our approach to our defense."  Ex. F, p. 10.  The prosecutor responded that prisoners at the jail are told "at the beginning of the recording" that their telephone call (except for calls directly to an attorney) are recorded."  *Id.*, at 14.  She said that:

> Every single call an inmate makes from the Leon County Jail is recorded.
> And we at times listen to those phone calls and they are monitored for
> admissions and all kinds of other reasons, we can collect evidence from
> those telephone calls.

*Id.* She said: "Had [Petitioner] not three-wayed through his girlfriend and had his girlfriend, himself, and his attorney on the line at the same time, that call never would have been recorded." *Id.* She said that prisoners know that their calls are subject to recording. *Id.* She said that Petitioner had abused the telephone system and she believed that no prisoner was allowed to loan his pin number to another prisoner to make a three way call. *Id.*, at 15.

The trial court expressed "grave reservations about the process" of recording a telephone call with an attorney. *Id.*, at 18. The court had "concern that law enforcement would take a conversation between a party and a defendant and his or her client and reveal that to the prosecution for use when apparently there's no representations that there's a security issue involved." *Id.*, at 19. But the court denied the motion to dismiss the information, reasoning:

> One, he's placed on notice that the phone conversations are subject to being recorded and monitored. More to the point, however, is that there was a third party call and that is that there was an individual who does not enjoy confidentiality who was privy to the phone call, and that's the girlfriend.

*Id.*, at 18. The court pointed out that even if the telephone call had not been monitored and recorded by jail officials, the girlfriend could be compelled to testify as to what she heard. *Id.*, at 18-19.

Petitioner renewed his objection by a motion for a new trial. Ex. B, R. 152-159. There counsel explained that he had previously been able to communicate with his clients in the Leon County Jail from a dedicated toll free telephone line. *Id.*, R. 153. In Late November or early December, 2002, the Leon County Sheriff terminated that telephone line without notification to anyone. *Id.*, R. 154. On February 14, 2003,

counsel received the call that is at issue here.  *Id.*  Counsel did not learn until the end of

the telephone call that it had been a three-way call facilitated by Josette Mutch,

Petitioner's girlfriend.  *Id.*  Counsel said that during the telephone call, he discussed

specific aspects of challenges to evidence, specific theories of defense, what witnesses

should be called and why, strategy for not calling specific witnesses, and specific

aspects of cross examination of State witnesses.  *Id.*, R. 154-155.  Counsel said that

immediately prior to trial, he was contacted by the prosecutor, Kathy Ray, who told him

that she had listened to the audio record of the telephone call and "was aware of the

trial strategy to be employed during the trial."  *Id.*, R. 155.  Counsel for Petitioner said

that he had asked the court for appointment of an independent prosecutor from another

jurisdiction, but that motion was denied.  *Id.*, R. 156.  Counsel represented that during

trial "it became apparent to the undersigned that the State's witnesses had been well

prepared for the exact lines of questioning and the theory of defense discussed during

the attorney-client conversation . . . ."  *Id.*

A hearing was held on the motion for a new trial.  Ex. B, R. 187-200.  The

prosecutor argued that two years after Petitioner was charged with the offense,

Petitioner listed Josette Mutch as an alibi witness for the crimes charged (not with

respect to the *Williams* rule Warren evidence).  *Id.*, R. 194.  The prosecutor suspected

that "this alibi being created two years later was something that perhaps the defendant

and Ms. Mutch got together to create after the fact."  *Id.*  For that reason, she said that

the prosecution began to listen to the recorded telephone calls that Petitioner made

from the jail.  *Id.*  The prosecutor said that "[e]very time the defendant gets on the phone

he's instructed that the call is subject to monitor recording, so is the person that's

accepting the call."  *Id.*, R. 197.  Petitioner's lawyer admitted that there are signs in the

jail stating "your call may be monitored."  *Id.*, R. 200.

This issue was raised on appeal and the appellate court affirmed this ruling

without an opinion.  Exs. G and I.  Respondent concedes that state court remedies were

exhausted as to this claim.  Doc. 20, p. 6.  The court, therefore, should address the

merits of the claim.

The "attorney-client privilege encompasses the Sixth Amendment right to

effective assistance of counsel."  United States v. Noriega, 917 F.2d 1543, 1551 n. 9

(11th Cir.), *cert. denied*, 498 U.S. 976 (1990).  This is so because "a communication

between an attorney and his client that is protected by the common law attorney-client

privilege is also protected from government intrusion by the sixth amendment."  *Id.*, at

1551, *quoting*, United States v. Blasco, 702 F.2d 1315, 1329 (11th Cir.), *cert. denied*,

464 U.S. 914 (1983).  However, "[i]t is not unusual or unreasonable to condition the use

of telephones by penal inmates on monitoring of the telephone calls by the authorities

charged with maintaining the security of the penal facility."  *Id.*, at 1551 n. 10.  To show

entitlement to the attorney-client privilege, there must be a showing that:

> (1) the asserted holder of the privilege is or sought to become a client; (2)
> the person to whom the communication was made (a) is [the] member of a
> bar of a court, or his subordinate and (b) in connection with this
> communication is acting as a lawyer; (3) the communication relates to a
> fact of which the attorney was informed (a) by his client (b) *without the
> presence of strangers* (c) for the purpose of securing primarily either (i) an
> opinion on law or (ii) legal services or (iii) assistance in some legal
> proceeding, and not (d) for the purpose of committing a crime or tort; and
> (4) the privilege has been (a) claimed and (b) not waived by the client.

917 F.2d at 1550 (emphasis added, citations omitted).

Petitioner did not have an attorney-client privilege in this recorded telephone call. Petitioner elected to involve his girlfriend in his conversation with his lawyer.  The privilege was held by Petitioner and it could be waived by Petitioner.[6]  His girlfriend, who was a "stranger" to the attorney-client relationship, listened to the conversation between Petitioner and his attorney or had the opportunity to do so through an open line. Petitioner's girlfriend was not "reasonably necessary for the transmission of the communication" as intended by FLA. STAT. § 90.502(1)(c)2.  Although it was easier for Petitioner to speak to his lawyer by means of a three-way call, it was not necessary. Petitioner could have asked his girlfriend to ask his lawyer to call him or visit him, or Petitioner could have written a letter to his lawyer.  The presence of Petitioner's girlfriend during the communication negated the privilege.

Petitioner also knew the call would be monitored and recorded by jail officials because the call was placed to his girlfriend.  The privilege was negated for this second reason as well.

> The presence of the prison recording device destroyed the attorney-client privilege.  Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private.  The presence of the recording device was the functional equivalent of the presence of a third party.

United States v. Hatcher, 323 F.3d 666, 674 (8th Cir. 2003).

---

[6] The issue here is not whether Petitioner's attorney inadvertently waived the privilege.  Petitioner's lawyer was unaware that the telephone call to him was a three-way call and as soon as he learned that the prosecutor had an audio recording of the telephone call, he took steps to attempt to protect the privilege.  Hence, it is likely that a Florida court would hold that the privilege was not inadvertently waived by the lawyer. Abamar Housing and Development, Inc. v. Lisa Daly Lady Decor, Inc., 698 So. 2d 276 (Fla. 3d DCA), review denied, 704 So. 2d 520 (Fla. 1997).

The determination of whether a particular communication was privileged "would be relevant to the District Court's assessment of potential harm to [a defendant's] right to a fair trial." Noriega, 917 F.2d at 1551.  The court in that case did not decide, however, whether a fair trial might be denied even though there was no attorney-client privilege.[7]  It is conceivable that use by the prosecutor of this audio recording in this case gave the prosecutor an unfair competitive advantage sufficient to deny Petitioner a fair trial, even though there was no attorney-client privilege in the audio recording.  Our notion of a fair trial includes the idea that truth and justice are best assured when there is robust presentation of opposing views.  This assumes a level playing field.  The trial court here was troubled by that aspect of the objection but declined to disqualify the prosecutor and resolved the question against Petitioner.  It will be assumed without deciding that Petitioner's allegations implicate a due process claim of a denial of a fair trial.

It will also be assumed without deciding that this constitutional right was not consciously waived by Petitioner when he elected to talk with his lawyer in a three-way conversation, knowing that it might be monitored and recorded, though this second proposition is more doubtful.  The question, then, is to determine the standards by which such a right must be judged.  To do this, analogies must be consulted.

The complete absence of a lawyer to defend the accused is considered to be "structural" error, reversible under all circumstances.  Gideon v. Wainwright, 372 U.S.

_____

[7] In the absence of clear precedent, it is hard to see how the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," but this report and recommendation nonetheless explores the nature of the right asserted.

335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel).  Structural error,

however, has been found in only a very limited number of cases.[8]  Most constitutional

error can be harmless.  Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 1833,

144 L.Ed.2d 35 (1999).

The error alleged here is not structural error because Petitioner was defended by

an attorney throughout the proceedings.  There has been no showing that the

prosecutor's possession of the audio recording *entirely* denied Petitioner of the services

of a lawyer in his defense.  Nor has there been any claim that the turning over of the

audio tape caused Petitioner's attorney to be ineffective as understood under the Sixth

Amendment in any particular way.[9]

---

[8] Those instances were listed in Neder v. United States, 527 U.S. 1, 19 S.Ct. 1827, 144 L.Ed.2d 35 (1999):

> [W]e have found an error to be "structural," and thus subject to automatic reversal, only in a "very limited class of cases."  *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (*citing Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable-doubt instruction)).

Neder v. United States, 527 U.S. at 8, 119 S.Ct. at 1833.

[9] If that were the claim, Petitioner should have raised it after the trial in a Rule 3.850 motion.  Further, such a claim fails because there has been no showing of prejudice to the outcome as required by Strickland.

Therefore, the error, if any, is to be analyzed using the harmless error standard used on collateral review.  That standard is whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  Grossman v. McDonough, 466 F.3d 1325, 1339 (11th Cir. 2006), *cert. denied*, 127 S.Ct. 2430 (2007) (distinguishing this from the "harmless beyond a reasonable doubt" standard), *quoting*, Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), *and citing*, Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

The same kind of standard would be employed if this court were to view this claim as a species of prosecutorial misconduct, as framed by Petitioner's lawyer at trial.  Prosecutorial misconduct can be so significant as to deny an accused a fair trial in violation of due process.  Donnelly v. DeChristoforo, 416 U.S. 637, 643-645, 94 S.Ct. 1868, 1871-1872, 40 L.Ed.2d 431 (1974) (prosecutorial argument); Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (knowing use of false testimony).  In either case, the pivotal question is whether the accused has shown that there is a reasonable probability that the outcome of the trial would have been different or would have affected the judgment of the jury had the conduct not occurred.  United States v. Wilson, 149 F.3d 1298, 1301 (11th Cir. 1998) (prosecutorial argument); Tomkins v. State, 193 F.3d 1327, 1339 (11th Cir. 1999), *cert. denied*, 531 U.S. 861 (2000) (knowing use of false testimony).

State law uses the same standard:

[D]isqualification [of a state attorney] is proper only if specific prejudice can be demonstrated.  *State v. Clausell*, 474 So. 2d 1189, 1190 (Fla. 1985).  Actual prejudice is "something more than the mere appearance of

impropriety."  *Meggs v. McClure*, 538 So. 2d 518, 519 (Fla. 1st DCA 1989).  Disqualification of a state attorney is appropriate "only to prevent the accused from suffering prejudice that he otherwise would not bear." *Id.* at 519-20.

<u>Huggins v. State</u>, 889 So. 2d 743, 768 (Fla. 2004), *cert. denied*, 545 U.S. 1107 (2005). The Court indicated, however, that "specific or actual prejudice will not be required where the appearance of impropriety is strong."  *Id.*, 889 So. 2d at 768 n. 13.  But the two cases cited for that rule were cases where the prosecutor may have come into possession of information protected by the attorney-client privilege *and* there was no waiver of the privilege.  The Court said:

> For example, this Court has held that a pretrial motion to disqualify a prosecutor who previously defended the defendant in any criminal matter that *involved or likely involved* confidential communications with the same client should be granted.  *See Reaves v. State*, 574 So. 2d 105, 107 (Fla. 1991).  As well, this Court has held that personal assistance to the prosecution by a defendant's prior counsel created a sufficient appearance of impropriety to warrant a disqualification.  *See Castro v. State*, 597 So.2d 259, 260-61 (Fla.1992).

889 So. 2d at 768 n. 13 (emphasis added).

Petitioner here has not alleged specific facts to show a substantial and injurious influence upon the jury's verdict or a reasonable probability that the jury's judgment would have been different.  At best, Petitioner has shown (by reference to his attorney's arguments in support of the motion for a new trial) that his attorney's cross examination of prosecution witnesses was less effective than it might have been had those witnesses not been prepared with knowledge of the way in which he would conduct the cross examination, and that the witnesses were well prepared in their direct examination.  No particular question and answer has been identified, however.  It is probably true that the prosecution's case went more smoothly after hearing the audio

recording, but there has been no showing that the prosecution put on false evidence, or that a witness lied because he or she knew what the cross examination would be; or, for that matter, that Petitioner would have achieved a different outcome had he been able to cross examination prosecution witnesses without such preparation.  Therefore, even if Petitioner has shown a due process violation that was not waived, a question not decided here, he has not shown that the error had a substantial and injurious effect upon the jury's verdict.  If there was constitutional error, therefore, the error was harmless.

Thus, Petitioner has not shown that the state court's adjudication of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  § 2254(d)(1) and (2).  Ground one affords no relief.

**Ground Two**

Petitioner contends in ground two that collateral crimes evidence at trial denied his rights under the Fifth, Sixth, and Fourteenth Amendments.  Doc. 1, p. 4; p. 5 on ECF.  Respondent argues that Petitioner failed to exhaust state court remedies as to this federal claim.  Doc. 20, p. 6.  Petitioner now agrees with Respondent and has now withdrawn this claim.  Doc. 24, p. 7.

**Ground Three**

Petitioner contends that his attorney was ineffective for failing to present Josette Mutch as an alibi witness.  He contends that Mutch was willing to testify with respect to the Warren robbery, which was introduced as *Williams* rule evidence to show

preparation, plan, and intent.  Doc. 1, pp. 5-5a; pp. 9-10 on ECF.  He asserts that Mutch

should have been called as a witness at the *Williams* rule hearing.  *Id.*, p. 5a; p. 10 on

ECF.  He argues that had she been called as a witness, the First District Court of

Appeal, which reversed the trial court's earlier ruling that this evidence was

inadmissible, would have ruled otherwise.  *Id.*  Respondent agrees that state court

remedies were exhausted as to this claim.  Doc. 20, p. 7.

Despite Respondent's concession that state court remedies were properly

exhausted, it does not appear that they were.[10]  Petitioner's claim in his Rule 3.850

motion was that his attorney was ineffective for failing to call Mutch as an alibi witness

*at trial*, not at the pretrial *Williams* rule hearing.  Ex. J, Rule 3.850 motion, R. 8

(asserting that Josette Mutch "was readily available to testify at trial").  Petitioner there

said that Mutch would have testified that it was impossible for him to have been involved

in the robbery of Warren because on that evening it was the "six (6) month 'anniversary'

of the first time Defendant told her that he loved her." *Id.*, R. 9.  He argues that this alibi

evidence was crucial to impeach the Warren robbery evidence at trial.  *Id.*  Petitioner

claimed that the outcome of the trial would have been different had his attorney called

Mutch as a trial witness.  *Id.*, R. 10.

That is also the claim adjudicated by the state court.  *Id.*, Order Denying Motion

for Postconviction Relief Filed 9/2/06, R. 16.  The trial court noted that Mutch had been

listed as a possible witness, and the topic of alibi witnesses was acknowledged in open

court.  But there was an extended break during the trial for Petitioner and his lawyer to

---

[10] This court must examine the state court's ruling to apply § 2254(d), and this
necessarily involves identification of the claim determined by the state court.

confer about whether to call any witnesses, after which the lawyer rested without calling any witnesses.  *Id.*  The court found this to have been a strategic decision in which Petitioner participated.[11]  *Id.*  The court also found no prejudice to the outcome.  *Id.*, R. 17.  The court noted that the victim had picked Petitioner's photograph from a lineup of 18 photographs.  *Id.*  The court also observed that the van had been stolen two hours before the victim was kidnaped by men driving the stolen van; and Petitioner's hand prints were found on both the stolen van and the victim's car, showing without doubt that Petitioner was one of the persons who robbed and kidnaped the victim.  *Id.*

It therefore appears the claim now presented is procedurally barred.  *See*, <u>Kelley v. Secretary for Dept. of Corrections</u>, 377 F.3d 1317, 1344-1345 (11th Cir. 2004), *cert. denied*, 545 U.S. 1149 (2005) ("habeas petitioners may not present particular instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts") (collecting cases).  Respondent, however, has addressed the merits of the claim, this court will do likewise.  Since the state court did not address the claim before this court, there is no ruling as to which deference is required.[12]

Petitioner's attorney filed a motion in limine to exclude the Warren kidnaping evidence, arguing that the crimes were not sufficiently similar to the crimes with which

---

[11] This is supported by the record.  When asked if he was going to present evidence in defense, trial counsel said: "Mr. Curry and I need more than a moment to discuss that."  Ex. F, trial transcript, p. 405.  A lunch recess then took place and Petitioner's attorney announced rest without calling any witnesses.  *Id.*, pp. 406-407.

[12] The state court considered the prejudicial effect upon the verdict at trial of allowing the *Williams* evidence of the Warren robbery to stand without the alleged impeaching effects of alibi testimony from Josette Mutch.  The claim before this court is that the Warren evidence would have never been admitted at trial at all had Petitioner's counsel called Mutch as a witness in the pretrial hearing.

Petitioner was charged, the evidence would be more prejudicial than probative, and the Warren offenses would improperly become "a feature of the trial."  Ex. B, R. 20.

A hearing upon whether the Warren evidence would be allowed at trial as *Williams* rule evidence was held on March 8, 2002.  Ex. B, R. 40.  The only witness was called by the State, investigator Christopher Summers.  *Id.*, R. 42, 44.  The State argued that the Warren crime should be in evidence to show "identity and *modus operandi.*"  *Id.*, R. 79.  Petitioner's attorney argued that the crimes were not sufficiently similar for admission for these purposes, that it would become a feature of the trial, and that the prejudice outweighed the probative value.  *Id.*, R. 86-90.  The court ruled in Petitioner's favor, finding that the two crimes were not so unique and similar for the evidence of the Warren offense to be admissible.  *Id.*, R. 92.  The court said that the "dissimilarities are more than sufficient to override the two or three similarities."  *Id.*, R. 93.  The court further explained that it did not matter that Warren had identified Petitioner as one of his assailants.  *Id.*, R. 95.  The court said that while that would be important evidence in a trial of Petitioner for the Warren offense, the *Williams* rule did not permit evidence of that crime as proof that Petitioner committed the offense for which he was on trial.  *Id.*

The State successfully sought certiorari review of this ruling.  The First District Court of Appeal ruled:

> In this case, since the cumulative effect of the similarities between the two robberies demonstrate a unique pattern of criminal activity and the dissimilarities are inconsequential, the trial court erred in excluding evidence of the collateral crime.  Also, the trial court improperly ruled that such evidence would be unduly prejudicial because it would become the main feature of the trial, where it's within the trial court's authority to prevent such an occurrence.

State v. Curry, 831 So. 2d 781, 782 (Fla. 1st DCA 2002).

The question before this court, therefore, is whether Petitioner's attorney would have succeeded in the exclusion of the evidence of the Warren crime had he called Josette Mutch as a witness in the pretrial hearing, *and* whether the outcome at trial would have been different without the Warren evidence.  But aside from his own allegation that Mutch would have testified that Petitioner was with her when the Warren crimes occurred, Petitioner has not specifically alleged what Mutch would have said if called as a witness and he has not submitted an affidavit from Mutch.  He did not do so in his Rule 3.850 motion either, with regard to the failure to call Mutch as a trial witness.  The claim, therefore, is and was insufficient.  "Conclusory allegations of ineffective assistance are insufficient."  Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992) (drug quantity at sentencing, failure to allege specific facts), *quoting*, United States v. Lawson, 947 F.2d 849, 853 (7th Cir. 1991) (same); Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir. 1985), *cert. denied*, 479 U.S. 918 (1986) (defendant's conclusory allegations about the testimony of uncalled witnesses are insufficient to state a claim of ineffective assistance of counsel); Bolder v. Armontrout, 921 F.2d 1359, 1363-1364 (8th Cir. 1990), *cert. denied*, 502 U.S. 850 (1991); United States v. Vargas, 920 F.2d 167, 169-170 (2d Cir. 1990), *cert. denied*, 502 U.S. 826 (1991).

Further, this insufficient pleading resulted in a failure to develop the facts in the Rule 3.850 proceeding.  In state court,

> the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, *himself or herself contributing to the absence of a full and fair adjudication in state court*, § 2254(e)(2) prohibits an evidentiary hearing to develop the

relevant claims in federal court, unless the statute's other stringent
requirements are met.

(Michael) Williams v. Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479, 1491, 146 L.Ed.2d 435

(2000) (emphasis added).  Those "stringent requirements" are not implicated here.  *See*

§ 2254(e)(2)(A)(i) and (ii) (requiring, as a preliminary matter, that the evidence not

developed in state court be based either on a new rule of law, or on facts not previously

discoverable by due diligence).

Petitioner's claim, therefore, is unsupported and not persuasive.  Mutch was

Petitioner's girlfriend.  Apparently the idea of an alibi came late in the case, nearly two

years after the case commenced, and the alleged alibi initially was for the charge for

which Petitioner was on trial, not for the Warren crimes.  The victim testified that at one

point, the driver of the vehicle in which she was captive talked with a female and told

her that he was going to shoot the victim.  Ex. F, pp. 104-105.  If Mutch was this female,

she probably would have been rather reluctant to take the witness stand under oath.

Moreover, Petitioner frequently used the telephone from the jail to speak to Mutch, and

the State had the audio recordings of those conversations.  Petitioner does not now

represent that those conversations contained information favorable to his defense.

Perhaps the conversations had nothing to do with the kidnaping charge, but it is

certainly possible that the State had recorded evidence tending to show that Petitioner

and Mutch fabricated some alibi defense.  Petitioner's counsel used the most

reasonable arguments that he had to try to exclude the evidence of the Warren crimes,

and he was initially successful.  Petitioner has not shown that the Warren evidence

ultimately would not have come in if Mutch had been called as a witness at the pretrial

hearing.  Failing to call Mutch as a witness at the *Williams* hearing was neither attorney error nor prejudicial to the outcome at trial.  This ground, therefore, is without merit.

**Ground Four**

Petitioner contends that his attorney was ineffective for failing to object to photographic evidence at trial.  Doc. 1, p. 5; p. 9 on ECF.  Petitioner does not specify which photographs he means, but in his response, he contends that he means the photographs of the stolen van.  Doc. 24, p. 10.  But he also agrees that he cannot prove "deficient performance and prejudice on this issue at all."  *Id.*  Thus, Petitioner has abandoned this claim.

**Conclusion**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by Derek Curry challenging convictions for armed robbery, armed kidnaping, and armed carjacking in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 2001CF3803A1, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on October 21, 2008.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.